UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA
U.S. Department of Justice
450 Fifth Street NW, Suite 4000
Washington, DC 20530,

   *Plaintiff*,

  v.

QUAD/GRAPHICS, INC.
N61 W23044 Harry's Way
Sussex, WI 53089,

QLC MERGER SUB, INC.
N61 W23044 Harry's Way
Sussex, WI 53089,

and

LSC COMMUNICATIONS, INC.
191 North Wacker Drive
Chicago, Illinois 60606,

   *Defendants*.

## COMPLAINT

  The United States of America, acting under the direction of the Attorney General of the United States, brings this civil action to enjoin the proposed acquisition by Defendant Quad/Graphics, Inc. ("Quad") of Defendant LSC Communications, Inc. ("LSC"). The United States alleges as follows:

1

### I. INTRODUCTION

1.  The combination of Quad and LSC—the two most significant magazine, catalog, and book printers in the United States—threatens to increase prices, reduce quality, and limit availability of printed material that millions of Americans rely on to receive and disseminate information and ideas. Although printing several pages of text is a simple task, many magazines, catalogs, and books require complex printing equipment and distribution networks. In the United States, Quad and LSC's printing and distribution resources vastly exceed those of other competitors and the two serve as the only realistic options for many publishers and retailers that rely on these firms' resources and experience to ensure that high-quality products reach consumers in an efficient and timely manner. Quad and LSC compete head-to-head on price and quality to win customers' business. By eliminating the "intense rivalry" between these two firms, the proposed merger would deny their customers the benefits of competition and likely increase the price and reduce the availability of products from popular magazines to grade school textbooks.

2.  Competition between Quad and LSC has resulted in better prices, greater output, and higher quality for magazine, catalog, and book printing in the United States. These two firms are one another's "#1 competitor." They bid aggressively against each other by leveraging their scale and scope, and by undercutting one another's prices. As competition between the two reduced their margins, Quad and LSC contemplated a merger that would dramatically consolidate the industry. As LSC CEO Tom Quinlan remarked to investors mere months before the current deal was announced, combining LSC and Quad would eliminate "battle[s]" between the two and could help lead to "[p]ricing stability."

3. If not enjoined, Quad's proposed acquisition of LSC would bring about "pricing stability" and end the aggressive competition that has resulted in lower prices and greater benefits to their customers. Quad would control the vast majority of magazine, catalog, and book printing in the United States, leaving many of the nation's publishers and retailers with few, if any, other competitive options. Accordingly, the proposed acquisition likely would lessen competition substantially in the markets for magazine, catalog, and trade and education book printing services in the United States in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and should be enjoined.

## II. DEFENDANTS AND THE PROPOSED ACQUISITION

4. Quad/Graphics, Inc. is a Wisconsin corporation headquartered in Sussex, Wisconsin. It offers a variety of printing services, including magazine, catalog, and book printing services, to publishers across the country. In 2018, Quad's revenues were approximately $4.2 billion. QLC Merger Sub, Inc. ("QLC") is a Delaware corporation headquartered in Sussex, Wisconsin. It is a wholly-owned subsidiary of Quad.

5. LSC Communications, Inc. is a Delaware corporation headquartered in Chicago, Illinois. In 2016, it was spun off from printing firm R.R. Donnelley. LSC offers a similar set of magazine, catalog, and book printing services as Quad. In 2018, LSC's revenues were approximately $3.8 billion.

6. On October 31, 2018, Quad announced that it would, via its subsidiary QLC, acquire LSC in an all-stock transaction valued at approximately $1.4 billion, including the assumption of debt.

## III. THE PRINTING INDUSTRY

### A. The Printing Process

7. The printing process plays a crucial role in delivering magazine, catalog, and book content to consumers, and many publishers establish multi-year contracts with printers to ensure high-quality product reaches consumers on time. The process of printing, finishing, and distributing publications typically begins when the printer receives content from a publisher that it has under contract, often with only a narrow window of time for the printer to produce and deliver the final product. Based on the order's specifications, including the required print quality and number of units, the printer schedules production, determines the optimal type of press, and assigns the order to one or more of its printing facilities after factoring in available capacity and the best geographic location for efficient distribution.

8. Printing and binding equipment is central to the printing process. The printing and binding equipment necessary for commercial publication printing is not only costly, but it requires large facilities and may take several years to plan for, purchase, and install. The type of printing equipment used is largely determined by the number of units ordered (the "run"), and the required print quality. For shorter runs, publishers may turn to printers offering digital presses and sheet-fed offset presses. For longer runs, publishers turn to printers offering web offset presses and high-quality rotogravure presses. Although Quad and LSC provide printing services on digital and sheet-fed offset presses, as reflected in the chart below, they control a particularly high percentage of web offset presses and all rotogravure presses in the United States.

4



9. After the material is printed, the printer also uses binding equipment to finish the product in one of a variety of binding styles, including hard and soft cover book binding, and saddle stitched or perfect bound magazine and catalog binding. Binding and printing equipment are often integrated into the same production line. Although combining several lines of binding and printing equipment requires a large production facility, doing so is critical for timely, efficient production.

10. Distribution is the final step in the process that Quad and LSC provide their customers. For products that are delivered directly to consumers, such as catalogs and magazines, printers offer cost-saving postal distribution services. Postage is a significant expense that is typically much greater than the cost of printing a magazine or catalog itself. Printers can help their customers save on these expenses and receive postal discounts by taking over key tasks that the U.S. Postal Service ("USPS") would typically handle, including

delivering pre-sorted mail—from a broad range of ZIP-codes down to the house-by-house order of a mail carrier's route—into the postal system. With sufficient volume and infrastructure, printers "co-mail" by bundling and pre-sorting across multiple customers to receive larger discounts than those magazines or catalogs could achieve independently. Additionally, printers deliver magazines and catalogs to central USPS distribution centers, or, for even more savings, to the individual post offices from which mail carriers leave with their deliveries. Although a few other printers offer similar distribution services to Quad and LSC, those smaller competitors are less effective and dismissed at times as "disorganized losers." For products that are distributed through other channels, such as books, the printer may warehouse the order at its own facility for the publisher, or deliver it to a retailer, wholesaler, or distribution center.

**B.     Types of Printed Products Most Impacted by the Transaction**

11.     *Magazines*. Every year, over five billion magazines are printed and distributed to consumers through newsstands and mailboxes. Because readers and advertisers expect a high-quality product, and publishers need efficient delivery at low cost, magazines are typically printed on the web offset and rotogravure presses that are owned principally by Quad and LSC. Additionally, in order to save on costs, many publishers leverage co-mail services offered by the merging firms that bundle and distribute publications directly into the postal system.

12.     *Catalogs*. Catalogs are not only a means by which consumers can purchase goods, but also effective advertising tools to drive consumers to stores or websites after receiving the catalog in the mail. Catalogs are such an integral component of some businesses' sales channels that even brief interruptions in catalog distribution are met with material order reductions. Increasingly, retailers are also employing advanced personalization strategies where different versions of the same catalog are printed to cater to different customer profiles.

Additionally, catalog publishers rely heavily on co-mail services offered by printers because nearly all are distributed to customers through the postal system.

13. *Books*. Book printing is another category in which Quad and LSC have a particularly strong presence. The broad category of general interest fiction and non-fiction black-and-white books that are typically found in bookstores are called "one-color trade books." These include a wide variety of books, from mystery novels to bestselling biographies. Quad and LSC also compete closely for printing "education books." Education books include both black-and-white and color books for K-12 and university students. Frequently both education and one-color trade books require long print runs, making the web offset presses owned by Defendants the most practical, cost-effective options in many cases. For many education and one-color trade books, overseas printers are not realistic alternatives to domestic trade and education book printers because of the need for quick turnarounds on print orders. Transportation expenses associated with shipping bulky printed materials may also outweigh any cost savings associated with overseas printing facilities.

14. Publishers and their customers will continue to demand printed magazines, catalogs, and books in the future. A digital-only platform is not an effective substitute to print for many publishers and publications because consumers do not all want to consume magazines, catalogs, and books exclusively in digital formats, even though digital versions of some magazines, catalogs, and books are available and some publishers have chosen a digital-only format for some publications. Notably, the demand for book printing is actually increasing, contrary to industry expectations a few years ago that electronic books would largely supplant printed books. Because large consumer segments will continue to demand printed publications

into the foreseeable future, publishers will continue to produce physical magazines, catalogs, and books.

### C. Competition in the Printing Industry

15. Quad and LSC dominate the magazine, catalog, and book printing services markets, and each views the other as its primary, and often only, competitor. Publishers routinely play these two firms off the other to receive better prices, quality, and innovative offerings, resulting in rounds of fierce competition to secure multi-year printing contracts. The intensity of competition has concerned many at Quad, including one senior executive who remarked, "We've been in a price war with them for some time. Don't see that changing."

16. Quad is LSC's "main competitor" in magazine printing services and, with "Quad and [LSC] control[ing] more than half of all publication printing" for magazines, the two frequently duel over accounts. In one such episode, LSC tried to win a magazine account away from incumbent Quad. On hearing of the potential loss to LSC, Quad's CEO responded personally by dropping Quad's price 25%. When the publisher returned to LSC and described the "Godfather deal" the Quad CEO had offered, LSC responded with even better terms, continuing a cycle of improved bids that resulted in around $6.5 million in immediate benefits to the publisher. Because of the strong LSC response to Quad's offer, the publisher moved the account to LSC. Competition like this has prompted many, including LSC's magazine head, to avoid any negative changes to customer accounts, such as altering freight or co-mail arrangements, out of fear of the customer going back into the market and LSC "get[ing] into a blood bath with Quad."

17. Catalog printing services is a "two-horse race between LSC and Quad," with the two firms holding a combined 69% share of the market according to a Quad Board of Directors

8

deck. Much like magazines, customers frequently play the two off one another for better contract terms. For example, Quad had been the incumbent for one catalog publisher for over twenty years. After multiple rounds of improving bids, however, LSC won the business with a superior offer that included a $1.4 million signing bonus. On informing Quad of its disappointment with the loss, the customer added that it was nevertheless "pleased with the outcome from a pricing standpoint." In another episode, after learning of an LSC offer that was "concerning on multiple levels," Quad's CEO proposed a "massive signing bonus" to keep a major customer. When the final offers were weighed, the customer informed Quad that LSC had won. Given the intensity of the competition, however, rather than accepting the loss Quad's CEO offered to improve the package and double the signing bonus to $10 million. Ultimately, LSC won the battle and secured what LSC's head described as "a great win." The cost of these competitive catalog episodes is not lost on Quad and LSC. On hearing of the merger, for example, one Quad executive reflected on a recent account battle between Quad and LSC and remarked, "I admit, in the case of [a large customer] I'm taking significant satisfaction in the news . . . . I'm sure it's a bitter pill to swallow for them including one source for gravure moving forward."

18. Quad and LSC are also aggressive competitors and key rivals in book printing. As Quad executives explained in an internal presentation, "we are the only printer other than LSC that can offer the largest Publishers a complete solution." This structure has resulted in substantial head-to-head competition between the two firms. For example, in one round of bidding for a major book publisher, four firms initially bid, but the publisher shortlisted Quad and LSC as the only bidders capable of handling the account. Quad came into the bid with an aggressive offer, alarming many at LSC. As one executive described it, "Quad is on fire,

9

promising everything." As bidding intensified, the LSC executive exclaimed that bidding for the publisher is "the battleground. It's Gettysburg. We must win." When Quad submitted its final offer that would save the publisher $37 million over its current arrangement, however, it won the account. Quad and LSC executives have lamented the ease with which publishers play the two firms off one another, commenting in one such instance that a publisher was "exploiting the fact that LSC [and] Quad['s] CEO's want to beat each other into oblivion." Episodes like these demonstrate why LSC's CEO told investors that a merger with Quad could achieve "pricing stability" and eliminate such "battle[s]" between the companies.

19. Overall, publishers and consumers have benefitted from the lower prices and quality improvements that have resulted from the intense head-to-head competition between Quad and LSC for printing services. Quad's proposed acquisition of LSC would eliminate that competition.

## IV. RELEVANT MARKETS

20. *Magazine Printing Services*. Printing services sold to U.S. publishers of magazines distributed in the U.S. constitute a relevant antitrust market and line of commerce under Section 7 of the Clayton Act. Printing services include the printing, binding, and distribution of magazines. A hypothetical monopolist of magazine printing services sold to U.S. publishers could profitably increase prices by at least a small but significant and non-transitory amount.

21. *Catalog Printing Services*. Printing services sold to U.S. publishers of catalogs distributed in the U.S. constitute a relevant antitrust market and line of commerce under Section 7 of the Clayton Act. Printing services include the printing, binding, and distribution of catalogs.

A hypothetical monopolist of catalog printing services sold to U.S. publishers could profitably increase prices by at least a small but significant and non-transitory amount.

22. *One-Color Trade Book Printing Services*. Printing services sold to major U.S. publishers of one-color trade books distributed in the U.S. constitute a relevant antitrust market and line of commerce under Section 7 of the Clayton Act. One-color trade books include fiction and non-fiction general interest books printed in black and white. Printing services include the printing and binding of such books. Major trade book publishers that require capacity to print in high-volume print runs have different needs than small, independent publishers with limited sales. A hypothetical monopolist of one-color trade book printing services sold to major U.S. publishers could profitably increase prices by at least a small but significant and non-transitory amount.

23. *Education Book Printing Services*. Printing services sold to major U.S. publishers of education books distributed in the U.S. constitute a relevant antitrust market and line of commerce under Section 7 of the Clayton Act. Education books include K-12 and college textbooks and workbooks printed in either black and white or color. Printing services include the printing and binding of such books. Major education book publishers that require high-volume print runs have different needs than small, independent publishers with limited sales. A hypothetical monopolist of education book printing services sold to major U.S. publishers could profitably increase prices by at least a small but significant and non-transitory amount.

24. No reasonably interchangeable substitutes exist for magazine, catalog, education, or one-color trade book printing services. Customers would not sufficiently shift to digital platforms to make a small but significant non-transitory increase in the price of printing services unprofitable. Demand for digital or printed content is driven by the consumer and reflects the

needs of the publisher and advertisers in those publications. Significant substitution between those two very different media would not occur in response to a small change in relative prices. As large customer segments continue to demand printed magazines, catalogs, and books, publishers must contract with printers to print such content.

## V. ANTICOMPETITIVE EFFECTS

25. The proposed acquisition would eliminate competition between Quad and LSC and significantly increase concentration in already concentrated markets. The proposed acquisition likely would lead Quad to, among other things, reduce printing capacity, reduce printing quality, and raise the prices of its printing services above those that would prevail absent the transaction. It would combine the two largest providers of magazine, catalog, and book printing services and prevent publishers from pitting Quad and LSC against each other in negotiations, raising publishers' costs. The proposed acquisition also likely would enable the merged firm to reduce capacity, limiting the availability or delaying the production of magazines, catalogs, and books.

### A. The Proposed Acquisition Would Significantly Increase the Concentration of Already Concentrated Markets

26. The proposed acquisition would result in a single firm with a significant share of each of the relevant markets. Although there are competitors to Quad and LSC in the relevant markets, they lack significant capacity, capabilities, and scale necessary to service many accounts. For example, LSC dismissed the next largest catalog printer (behind Quad and LSC itself) as a niche firm that merely "lives off our scraps." Similarly, in book printing, when LSC sales staff learned that one of the next largest printers might bid on a major account, they

described that competitor as a "band of bandits" and concluded, "it's all about [Q]uad, nobody else."

27. The proposed combination of Quad and LSC creates a presumption that the acquisition likely substantially lessens competition. The Supreme Court has held that mergers that significantly increase concentration in already concentrated markets are presumptively anticompetitive and therefore presumptively unlawful. To measure market concentration, courts often use the Herfindahl-Hirschman Index ("HHI"). HHIs range from 0 in markets with no concentration to 10,000 in markets where one firm has 100 percent market share. Courts have found that mergers that increase the HHI by more than 200 and result in an HHI above 2,500 in any market are presumed to be anticompetitive. Here, these criteria are met for each of the relevant markets. Quad's acquisition of LSC is therefore presumptively anticompetitive.

### B. The Proposed Acquisition Would Eliminate Competition Between Quad and LSC

28. The proposed acquisition would likely result in higher prices in the relevant markets than would exist absent the transaction. Printing services are critical for magazine, catalog, and book publishers, which resist substituting away from printing as large segments of readers and consumers demand such products. Quad and LSC frequently compete head to head for accounts, and engage in multiple rounds of bidding in which they repeatedly lower prices in response to the other. Moreover, because of the scale and the scope of their services, Quad and LSC are often the only two firms providing cost-effective printing services to many publishers. The combination of Defendants' superior scale, efficient high-volume equipment, and cost-saving co-mail distribution, results in the two firms being the only realistic option for many

publishers. The transaction would likely leave many of those publishers facing a single firm with the incentive and ability to increase the prices of its printing services.

29. The proposed acquisition is likely to reduce the quality of printing services, as well as innovation in the relevant markets. During negotiations, Quad and LSC offer better terms including improved delivery dates and printing schedules, printing at certain facilities on better equipment, or commitments to invest in equipment to handle publishers' specifications. In addition, during the execution of contracts, customers dissatisfied with the quality of printing services from Quad and LSC have threatened to switch their business from one to the other to enforce quality standards in their printing contracts. Absent the competitive threat that LSC serves, post-merger Quad would no longer have the incentive to make such quality commitments.

30. Defendants also have plans to reduce the merged firm's printing capacity by closing printing facilities around the country. As the printing industry has consolidated in recent years, printing capacity has been taken offline, leading to capacity shortages for publishers during peak times of the year. In bidding episodes, Quad and LSC have offered to make investments in additional equipment to assuage concerns about capacity and win the bid. The capacity reductions that would result from the transaction would exacerbate existing capacity issues in parts of the market. Although small competitors have the capacity to take on limited volume, this would not be sufficient to counteract a price increase by the merged firm.

31. Overall, head-to-head competition between Quad and LSC has spurred quality improvements and lower prices for magazine, catalog, and book printing services. The proposed acquisition would eliminate this important competitive pressure and allow Quad to limit

capacity, reduce quality, and increase price of printing without the constraints of significant market competition.

## VI. LACK OF COUNTERVAILING FACTORS

32. Barriers to economically meaningful entry or expansion in the magazine, catalog, and education and one-color trade book printing services markets are high, and thus new entry or expansion by existing competitors is unlikely to prevent or counteract the proposed acquisition's likely anticompetitive effects. Quad and LSC have built rival networks of printing facilities across the country that they each integrate into sophisticated distribution systems. Building a new printing facility, or even introducing new printing equipment to an existing facility, can take years to complete. Other firms seeking to enter the market or expand would need to spend a significant amount of time and money to acquire expensive printing equipment from one of a limited number of remaining sources for such equipment, build new facilities and accompanying infrastructure, and hire skilled workers from a limited employment pool. Even after taking on this costly and time-consuming investment, without the scale of orders needed to operate efficiently, the firm would not be able offer the same cost-effective postal distribution and other solutions as Quad and LSC do today.

33. Although Defendants allege that the proposed acquisition will generate synergies by combining the operations of the two largest printers in the country, those may actually harm competition by reducing available capacity, most are unlikely to be passed through to customers, and collectively they are far outweighed by the proposed acquisition's likely anticompetitive effects.

## VII. VIOLATION ALLEGED

34. The United States brings this action under Section 15 of the Clayton Act, 15 U.S.C. § 25, to prevent and restrain the Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18. This Court has subject matter jurisdiction over this action under Section 15 of the Clayton Act, 15 U.S.C. § 25.

35. Defendants Quad and LSC are engaged in interstate commerce and in activities substantially affecting interstate commerce. Quad and LSC sell magazine, catalog, and book printing services throughout the United States. They are engaged in a regular, continuous, and substantial flow of interstate commerce, and their printing services sales have had a substantial effect on interstate commerce.

36. This Court has personal jurisdiction over each Defendant. Both Quad and LSC are corporations that transact business within this district through, among other things, their sales of printing services.

37. Venue is proper in this district under Section 12 of the Clayton Act, 15 U.S.C. § 22.

38. If allowed to proceed, Quad's proposed acquisition of LSC would likely lessen competition substantially in the markets for magazine, catalog, one-color trade book, and education book printing services in the United States in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

39. Among other things, the transaction would:

    (a) eliminate significant head-to-head competition between Quad and LSC in the markets for magazine, catalog, and education and one-color trade book printing services;

    (b) likely cause prices of magazine, catalog, and education and one-color trade book printing services to be higher than they would be otherwise;

    (c) likely cause the quality of magazine, catalog, and education and one-color trade book printing services to decrease; and

    (d) likely reduce capacity for and output of printed magazines, catalogs, and education and one-color trade books.

## REQUEST FOR RELIEF

40. The United States requests:

    (a) that Quad's proposed acquisition of LSC be adjudged to violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

    (b) that the Defendants be permanently enjoined and restrained from carrying out the proposed acquisition of LSC by Quad or any other transaction that would combine the two companies;

    (c) that the United States be awarded costs of this action; and

    (d) that the United States be awarded such other relief as the Court may deem just and proper.

Dated this 20th day of June, 2019.

Respectfully submitted,

FOR PLAINTIFF UNITED STATES OF AMERICA:

_____
MAKAN DELRAHIM
Assistant Attorney General for Antitrust

_____
ANDREW C. FINCH
Principal Deputy Assistant Attorney General

_____
PATRICIA A. BRINK
Director of Civil Enforcement

_____
CRAIG W. CONRATH
Director of Litigation

_____
OWEN M. KENDLER
Chief
LISA A. SCANLON
Assistant Chief
Media, Entertainment & Professional Services Section

JOHN R. LAUSCH JR.
United States Attorney
Northern District of Illinois

THOMAS P. WALSH
Assistant United States Attorney
Northern District of Illinois
219 South Dearborn Street
Chicago, IL 60604

_____
WILLIAM H. JONES II
MEAGAN K. BELLSHAW
CORY BRADER LEUCHTEN
THOMAS P. DEMATTEO
EMMA DICK
IHAN KIM
CERIN M. LINDGRENSAVAGE
CRAIG D. MINERVA
JOHN R. READ
JONATHAN H. SILBERMAN
ADAM C. SPEEGLE
PAUL J. TORZILLI
JEFFREY G. VERNON

Media, Entertainment & Professional Services Section
Antitrust Division
U.S. Department of Justice
450 Fifth Street, N.W., Suite 4000
Washington, DC 20530
Telephone: (202) 514-0230
Facsimile: (202) 514-7308
E-mail: bill.jones2@usdoj.gov

18