# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) Case No. 1:19-cv-04153 |
| QUAD/GRAPHICS, INC., QLC MERGER SUB, INC., and LSC COMMUNICATIONS, INC., | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |

## QUAD/GRAPHICS, INC. AND QLC MERGER SUB, INC.'S
## ANSWER TO COMPLAINT

Defendants Quad/Graphics, Inc. ("Quad") and QLC Merger Sub, Inc. ("QLC") (collectively, "the Quad Defendants") answer the Complaint filed by the Antitrust Division of the United States Department of Justice (the "Division").

Quad and LSC Communications, Inc. ("LSC") together represent less than 10% of the overall U.S. commercial printing industry.[1] This industry is under assault. Between 2010 and 2018, print advertising—a category that includes magazine ads, catalogs, direct mail, and newspaper inserts—fell from a $55 billion industry to just a $19 billion one, a decline of over 65%. By 2022, print advertising is expected to fall another 47% to just $10 billion.[2] At the same time,

---

[1] *See* IBISWorld, *Out of Ink: Digital Media Alternatives and Low Demand Continue to Threaten Industry Revenue* (Sept. 2018), at 5 (projecting overall U.S. commercial printing revenue for 2018 to be $75.9 billion). According to the Complaint, Quad had 2018 revenue of approximately $4.2 billion, and LSC had 2018 revenue of approximately $3.8 billion. *See* Compl. ¶¶ 4-5. However, these revenues include both companies' international operations as well as non-printing operations, like marketing and logistics services. After excluding those revenues, neither Quad nor LSC represents more than 5% of the overall U.S. commercial printing industry.

[2] eMarketer, *U.S. Total Media Ad Spending, by Media* (Dec. 17, 2018). These declines do not include the separately reported category of directory advertisements (*e.g.*, phone book ads), which

digital advertising—a category that includes banner ads on websites as well as advertisements delivered by social media, mobile phones, and email—has mushroomed from a $26 billion industry in 2010 to a $111 billion industry in 2018, and is projected to reach $188 billion by 2022.

The Division's Complaint reflects serious errors of law, fact, economics, and common sense. The Division's Complaint ignores that all but only the very largest of print jobs require less than a day's worth of time on a single press, such that a multitude of printers can easily provide such print services. The Complaint ignores customers' ability to reduce its purchases of the specific type of print product and use another print format (*e.g.*, direct mail or retail inserts as alternatives to catalogs). The Complaint further ignores that any attempt to raise print prices above competitive levels would only accelerate the movement of customers and products from print version to an online or digital format. Among other defects, the Complaint fails to acknowledge that ***a printing press is a printing press***; in other words, the same equipment that is used to print the pages in a magazine can also be used to print the pages in a catalog, the pages in a trade book, and the pages in an education book. And the same equipment can also be used to print newspaper inserts, direct mail, phone books, professional books, children's books, calendars, and commercial brochures, along with many other forms of printed products. In fact, Quad prints ***all*** of these products using the same presses that it also uses to print magazines, catalogs, and trade and education books. Many, many other companies own printing presses that are just as good and adaptable as Quad's and LSC's. The Complaint's alleged separate and individual markets for

---

have reportedly fallen from a $12 billion category in 2008 to just $1.5 billion in 2018, and are projected to be less than $750 million by 2022.

magazines, catalogs, and certain narrow segments of trade and education books[3] fail as a matter of law.

The Quad Defendants answer the specific allegations in the Complaint as follows. The Quad Defendants deny each and every allegation of the Complaint except as expressly admitted or stated below:

> 1.     The combination of Quad and LSC—the two most significant magazine, catalog, and book printers in the United States—threatens to increase prices, reduce quality, and limit availability of printed material that millions of Americans rely on to receive and disseminate information and ideas. Although printing several pages of text is a simple task, many magazines, catalogs, and books require complex printing equipment and distribution networks. In the United States, Quad and LSC's printing and distribution resources vastly exceed those of other competitors and the two serve as the only realistic options for many publishers and retailers that rely on these firms' resources and experience to ensure that high-quality products reach consumers in an efficient and timely manner. Quad and LSC compete head-to-head on price and quality to win customers' business. By eliminating the "intense rivalry" between these two firms, the proposed merger would deny their customers the benefits of competition and likely increase the price and reduce the availability of products from popular magazines to grade school textbooks.

**<u>ANSWER</u>**:     The Quad Defendants admit that Quad and LSC are both printers of magazines, catalogs, books, and other products. As such, the Quad Defendants further admit that Quad has from time to time competed with LSC, among many other competitors, on price and/or quality to win customers' business. The Quad Defendants further admit that printing "is a simple task," whether it be printing "several pages of text" or printing millions of pages of text or images. The Quad Defendants deny the remaining allegations of Paragraph 1.

---

[3] Specifically, the Complaint alleges that the combination of Quad and LSC will lessen competition for printing services sold to "major U.S. publishers" of these books—a term that is not defined, but which apparently excludes "small, independent publishers." *See* Compl. ¶¶ 22-23. Moreover, with respect to trade books, the Complaint alleges only that the combination of Quad and LSC will lessen competition for the printing of "one-color" (*i.e.*, "black and white") trade books. *Id.* ¶ 22.

2.     Competition between Quad and LSC has resulted in better prices, greater output, and higher quality for magazine, catalog, and book printing in the United States.  These two firms are one another's "#1 competitor."  They bid aggressively against each other by leveraging their scale and scope, and by undercutting one another's prices.  As competition between the two reduced their margins, Quad and LSC contemplated a merger that would dramatically consolidate the industry.  As LSC CEO Tom Quinlan remarked to investors mere months before the current deal was announced, combining LSC and Quad would eliminate "battle[s]" between the two and could help lead to "[p]ricing stability."

**ANSWER**: The Quad Defendants admit that they contemplated and agreed upon a proposed transaction under which QLC, a wholly owned subsidiary of Quad, would merge with LSC.  The Quad Defendants further admit that Quad has from time to time competed with LSC, among many other competitors, on prices, output, and/or quality to win customers' business.  The Quad Defendants deny the remaining allegations of Paragraph 2.  In particular, the Quad Defendants deny that LSC's Chief Executive Officer Thomas Quinlan said to investors that "combining LSC and Quad would eliminate 'battle[s]' between the two and could help lead to '[p]ricing stability.'"  In actuality, Mr. Quinlan's public statement to investors quite adamantly denied that a combination of Quad and LSC would lead to pricing power.  The context of Mr. Quinlan's statement was LSC's earnings call on March 6, 2018.  An analyst asked Mr. Quinlan generally:  "[W]hen you look at M&A in the print business, how do you think about antitrust worries and is that looked at on a vertical-by-vertical basis or how do you think about that?"  Mr. Quinlan responded to this question in relevant part:

> ***If we get out of control and if we try to have pricing power, what do you think our clients do?  They will go electronic as we talked about today.  They will find other means to do things.***  So when we think about antitrust, I – I don't want to speak for everybody, but I look at it and say okay, who am I impacting?  Am I impacting so much where I finally have pricing power?  I would love for me to have pricing stability; that would be huge.  ***Pricing power, I don't see our industry ever having the benefit to have because of technology.  A press is a press, it can print anything.***

In follow-up to this comment, another analyst asked Mr. Quinlan: "You touched on a little bit [ago] about pricing power and how there will never be pricing power in this business. One argument is that a combined LSC and Quad/Graphics would have that pricing power, what's your view on that?" In relevant part, Mr. Quinlan's response to this question was:

> *I don't care if LeBron gets together with Kobe again. I mean, there is not going to be – there is alternatives to us, to our industry. . . . If we get out of whack on pricing, that will cause people to go . . . . At some point you get to the point where you force people to look for other means to go to do things. So that to me is where I think about pricing power.* Pricing stability, think about 1% to 2% that we battle each year, if that goes away, that's pretty helpful. Well, pricing power for us, I just don't look at it, given our industry, giv[en] technology, what's out there and what can take place in our industry . . . .

In short, the Quad Defendants state that the Complaint's purported quotation from Mr. Quinlan's remarks is incomplete, inaccurate, and unfaithful to what Mr. Quinlan actually said.

> 3. If not enjoined, Quad's proposed acquisition of LSC would bring about "pricing stability" and end the aggressive competition that has resulted in lower prices and greater benefits to their customers. Quad would control the vast majority of magazine, catalog, and book printing in the United States, leaving many of the nation's publishers and retailers with few, if any, other competitive options. Accordingly, the proposed acquisition likely would lessen competition substantially in the markets for magazine, catalog, and trade and education book printing services in the United States in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and should be enjoined.

**ANSWER**: The last sentence of Paragraph 3 contains legal conclusions to which no response is required. To the extent a response is deemed required, the Quad Defendants deny the allegations in the last sentence of Paragraph 3. The Quad Defendants deny the remaining allegations of Paragraph 3.

> 4. Quad/Graphics, Inc. is a Wisconsin corporation headquartered in Sussex, Wisconsin. It offers a variety of printing services, including magazine, catalog, and book printing services, to publishers across the country. In 2018, Quad's revenues were approximately $4.2 billion. QLC Merger Sub, Inc. ("QLC") is a

Delaware corporation headquartered in Sussex, Wisconsin. It is a wholly-owned subsidiary of Quad.

**ANSWER**:    The Quad Defendants admit the allegations of Paragraph 4.

5.    LSC Communications, Inc. is a Delaware corporation headquartered in Chicago, Illinois. In 2016, it was spun off from printing firm R.R. Donnelley. LSC offers a similar set of magazine, catalog, and book printing services as Quad. In 2018, LSC's revenues were approximately $3.8 billion.

**ANSWER**:    The Quad Defendants admit the allegation that LSC offers a "similar" set of magazine, catalog, and book printing services as Quad, with the caveat that many other printers offer the same or similar services as well. The Quad Defendants admit the remaining allegations of Paragraph 5.

6.    On October 31, 2018, Quad announced that it would, via its subsidiary QLC, acquire LSC in an all-stock transaction valued at approximately $1.4 billion, including the assumption of debt.

**ANSWER**:    The Quad Defendants admit the allegations of Paragraph 6, with the caveat that the market value of the transaction has decreased as—with the continuing decline of the print industry—the share prices for Quad's and LSC's shares have dropped since the announcement of the deal.

7.    The printing process plays a crucial role in delivering magazine, catalog, and book content to consumers, and many publishers establish multi-year contracts with printers to ensure high-quality product reaches consumers on time. The process of printing, finishing, and distributing publications typically begins when the printer receives content from a publisher that it has under contract, often with only a narrow window of time for the printer to produce and deliver the final product. Based on the order's specifications, including the required print quality and number of units, the printer schedules production, determines the optimal type of press, and assigns the order to one or more of its printing facilities after factoring in available capacity and the best geographic location for efficient distribution.

**ANSWER**:  The Quad Defendants deny the undefined and vague allegation that "many" publishers establish multi-year contracts with printers.  The Quad Defendants further deny the allegation that the printing process "typically" begins when the printer receives content from a publisher "that it has under contract."  ***In actuality, the vast majority of Quad's (and, on information and belief, its print competitors') magazine, catalog, and book customers are relatively small customers that only buy print services on a transactional, or "spot" basis, as opposed to doing so with multi-year contracts.***  Moreover, even the small number of very large customers that establish multi-year contracts with printers tend to also bid out much of their work on a non-contractual, spot basis.  In addition, the Quad Defendants deny the allegation that customers "often" have only a narrow window of time to have their product produced and delivered.  To the contrary, customers—particularly book customers—are usually able to plan their print purchases in advance, and therefore routinely either allow multiple weeks or months for their products to be printed, or else request that their products be printed "on demand" (which requires using different equipment than the web offset or rotogravure presses at issue in the Complaint).  The Quad Defendants further deny the allegation that a printer "determines the optimal type of press" for a particular order, and state to the contrary that the same press equipment is used to print different kinds and specifications of print products.  The Quad Defendants admit the remaining allegations of Paragraph 7.

> 8.     Printing and binding equipment is central to the printing process.  The printing and binding equipment necessary for commercial publication printing is not only costly, but it requires large facilities and may take several years to plan for, purchase, and install.  The type of printing equipment used is largely determined by the number of units ordered (the "run"), and the required print quality.  For shorter runs, publishers may turn to printers offering digital presses and sheet-fed offset presses.  For longer runs, publishers turn to printers offering web offset presses and high-quality rotogravure presses.  Although Quad and LSC

provide printing services on digital and sheet-fed offset presses, as reflected in the chart below, they control a particularly high percentage of web offset presses and all rotogravure presses in the United States.



**ANSWER**:     The Quad Defendants deny the allegations that the printing and binding equipment necessary for commercial publication printing is "costly," "requires large facilities," or "may take several years to plan for, purchase, and install."  To the contrary, high-quality printing and binding equipment is readily available for purchase on either a new or used basis, and can be purchased and installed in a matter of months.  The Quad Defendants deny the allegations in the third sentence of Paragraph 8, and state that factors such as scheduling, availability of free capacity, and the desired dimensions of the finished product influence the type of printing equipment that is used for a given print job.  The Quad Defendants also deny the undefined allegation that "[f]or longer runs," publishers must turn to web offset presses or rotogravure presses; the Quad Defendants do, however, admit generally that web offset and rotogravure presses have traditionally tended to be used for longer-run print jobs.  The Quad Defendants further deny the allegation that Quad and LSC "control a particularly high percentage of web offset presses."  The Quad Defendants further

deny that the chart included at the end of Paragraph 8 is accurate, among other reasons, because (i) there is no such thing as "magazine & catalog presses," and (ii) the chart excludes at least 140 commercial printers in the United States that also own web offset presses. The Quad Defendants admit that, to their knowledge, Quad and LSC together own all of the rotogravure presses used for print products in the United States; this fact, however, is immaterial, because (i) rotogravure presses are largely used for printing products like newspaper inserts (which are not alleged as a relevant product market); and (ii) consistent with precedent, the Division has not alleged that rotogravure printing is a distinct relevant market for antitrust purposes. *See generally In re R.R. Donnelly & Sons Co.*, 120 F.T.C. 36, 74 (1995) ("'[H]igh volume publication gravure printing' . . . is not a relevant market for the purposes of assessing the competitive effects of [an] acquisition."). The Quad Defendants admit the remaining allegations of Paragraph 8.

> 9.     After the material is printed, the printer also uses binding equipment to finish the product in one of a variety of binding styles, including hard and soft cover book binding, and saddle stitched or perfect bound magazine and catalog binding. Binding and printing equipment are often integrated into the same production line. Although combining several lines of binding and printing equipment requires a large production facility, doing so is critical for timely, efficient production.

**ANSWER**:     The Quad Defendants deny the allegations in the first sentence of Paragraph 9 to the extent that they suggest that "the printer" necessarily conducts the binding and finishing steps. The Quad Defendants further deny the allegations in the last sentence of Paragraph 9. To the contrary, there are a large number of third-party binderies that are readily able to bind printed pages in a timely and efficient manner. The Quad Defendants admit that binding and printing equipment are sometimes integrated into the same production line, but state that they do not need to be, and often are not, so integrated. The Quad Defendants admit the remaining allegations of Paragraph 9.

10. Distribution is the final step in the process that Quad and LSC provide their customers. For products that are delivered directly to consumers, such as catalogs and magazines, printers offer cost-saving postal distribution services. Postage is a significant expense that is typically much greater than the cost of printing a magazine or catalog itself. Printers can help their customers save on these expenses and receive postal discounts by taking over key tasks that the U.S. Postal Service ("USPS") would typically handle, including delivering pre-sorted mail—from a broad range of ZIP-codes down to the house-by-house order of a mail carrier's route—into the postal system. With sufficient volume and infrastructure, printers "co-mail" by bundling and pre-sorting across multiple customers to receive larger discounts than those magazines or catalogs could achieve independently. Additionally, printers deliver magazines and catalogs to central USPS distribution centers, or, for even more savings, to the individual post offices from which mail carriers leave with their deliveries. Although a few other printers offer similar distribution services to Quad and LSC, those smaller competitors are less effective and dismissed at times as "disorganized losers." For products that are distributed through other channels, such as books, the printer may warehouse the order at its own facility for the publisher, or deliver it to a retailer, wholesaler, or distribution center.

**ANSWER**: The Quad Defendants deny the allegation in the fifth sentence of Paragraph 10 that co-mailing requires printers to have "sufficient volume and infrastructure." The Quad Defendants admit the allegation that "other printers offer similar distribution services to Quad and LSC," but deny the allegation that those other competitors "are less effective" than Quad or LSC. To the contrary, customers often choose to use distribution services offered by other printers and/or by third-party providers. The Quad Defendants lack information sufficient to admit or deny the remaining allegations of the seventh sentence of Paragraph 10, and therefore deny these allegations. The Quad Defendants admit the remaining allegations of Paragraph 10.

11. *Magazines*. Every year, over five billion magazines are printed and distributed to consumers through newsstands and mailboxes. Because readers and advertisers expect a high-quality product, and publishers need efficient delivery at low cost, magazines are typically printed on the web offset and rotogravure presses that are owned principally by Quad and LSC. Additionally, in order to save on costs, many publishers leverage co-mail services

offered by the merging firms that bundle and distribute publications directly into the postal system.

**ANSWER**:   The Quad Defendants deny the allegations in the second sentence of Paragraph 11.[4] The Quad Defendants admit that certain customers take advantage of co-mail services offered by Quad and LSC, as well as by other printers and/or by a third party provider, to save on costs. The Quad Defendants admit the remaining allegations of Paragraph 11.

> 12.   *Catalogs*. Catalogs are not only a means by which consumers can purchase goods, but also effective advertising tools to drive consumers to stores or websites after receiving the catalog in the mail. Catalogs are such an integral component of some businesses' sales channels that even brief interruptions in catalog distribution are met with material order reductions. Increasingly, retailers are also employing advanced personalization strategies where different versions of the same catalog are printed to cater to different customer profiles. Additionally, catalog publishers rely heavily on co-mail services offered by printers because nearly all are distributed to customers through the postal system.

**ANSWER**:   The Quad Defendants admit that delays in the in-home delivery of catalogs can result in order reductions, but lack information sufficient to admit or deny the remaining allegations of the second sentence of Paragraph 12 and therefore deny these allegations. The Quad Defendants further admit that certain catalog customers take advantage of co-mail services, and that the majority of catalogs are distributed to customers through the postal system, but otherwise deny the allegations in the last sentence of Paragraph 12. The Quad Defendants admit the remaining allegations of Paragraph 12. In particular, the Quad Defendants admit that catalog customers are increasingly employing advanced personalization strategies where different versions of a catalog are customized for particular customers or customer segments or the catalog

---

[4] For purposes of Paragraphs 11, 12, 13, 20, 21, 22, and 23, the Quad Defendants have not counted the italicized opening words as "sentences," nor have the Quad Defendants regarded the italicized opening words as factual allegations to which a response is required. To the extent that responses to the italicized opening words are deemed required, the Quad Defendants deny the allegations.

customer elects to use a direct mail product instead of a catalog, and state that this trend is driving catalog printing away from the presses traditionally used for longer-run print jobs and instead driving it towards digital presses. The Quad Defendants therefore state that this trend allows even easier expansion by other printers and significantly increases the already intense competition facing Quad.

> 13. *Books*. Book printing is another category in which Quad and LSC have a particularly strong presence. The broad category of general interest fiction and non-fiction black-and-white books that are typically found in bookstores are called "one-color trade books." These include a wide variety of books, from mystery novels to bestselling biographies. Quad and LSC also compete closely for printing "education books." Education books include both black-and-white and color books for K-12 and university students. Frequently both education and one-color trade books require long print runs, making the web offset presses owned by Defendants the most practical, cost-effective options in many cases. For many education and one-color trade books, overseas printers are not realistic alternatives to domestic trade and education book printers because of the need for quick turnarounds on print orders. Transportation expenses associated with shipping bulky printed materials may also outweigh any cost savings associated with overseas printing facilities.

**ANSWER**: The Quad Defendants admit the allegations of the second, third, and fifth sentences of Paragraph 13. The Quad Defendants further admit that both Quad and LSC, along with a number of other printers, compete for the sale of book printing. The Quad Defendants deny the remaining allegations of Paragraph 13.

> 14. Publishers and their customers will continue to demand printed magazines, catalogs, and books in the future. A digital-only platform is not an effective substitute to print for many publishers and publications because consumers do not all want to consume magazines, catalogs, and books exclusively in digital formats, even though digital versions of some magazines, catalogs, and books are available and some publishers have chosen a digital-only format for some publications. Notably, the demand for book printing is actually increasing, contrary to industry expectations a few years ago that electronic books would largely supplant printed books. Because

> large consumer segments will continue to demand printed
> publications into the foreseeable future, publishers will continue to
> produce physical magazines, catalogs, and books.

**ANSWER**: The Quad Defendants admit that certain customers will continue to purchase

printed magazines catalogs, and books in the future; however, the Quad Defendants incorporate

by reference their response to Paragraph 12 to state that print products like magazines and catalogs

are becoming shorter, less frequent, and more personalized than ever before. As print runs become

shorter, they require less press time and smaller amounts of the already-available, significant,

excess capacity. The Quad Defendants lack information sufficient to admit or deny the remaining

allegations of the third sentence of Paragraph 14, and therefore deny these allegations. The Quad

Defendants deny the remaining allegations of Paragraph 14.

> 15.     Quad and LSC dominate the magazine, catalog, and book
> printing services markets, and each views the other as its primary,
> and often only, competitor. Publishers routinely play these two firms
> off the other to receive better prices, quality, and innovative
> offerings, resulting in rounds of fierce competition to secure multi-
> year printing contracts. The intensity of competition has concerned
> many at Quad, including one senior executive who remarked,
> "We've been in a price war with them for some time. Don't see that
> changing."

**ANSWER**: The Quad Defendants admit that Quad has from time to time competed with LSC,

among many other competitors, on price, quality, and/or innovation to win customers' business,

including from the small number of very large customers that choose to negotiate "multi-year

printing contracts." The Quad Defendants further admit that the Complaint purports to quote an

unspecified document for the proposition that Quad and LSC were in a "price war," but deny any

characterization thereof. In particular, the Quad Defendants state: (i) that the document in

question was not prepared by a "senior executive" of Quad as alleged in the Complaint; (ii) that

the document pertains in large part to retail inserts (which is a business that LSC largely sold off

in 2018), and does not pertain in any way to books; and (iii) that when asked about the document

in a deposition, the document's author testified that "***we've been in a price war – since we're***

***using that term – in our industry with every competitor, not just LSC***.  We just happened in this

exchange to be talking about an LSC and Quad comparison, but that phenomenon, that situation

was not exclusive to us against LSC, is not."  The Quad Defendants deny the remaining allegations

of Paragraph 15.

> 16.    Quad is LSC's "main competitor" in magazine printing
> services and, with "Quad and [LSC] control[ing] more than half of
> all publication printing" for magazines, the two frequently duel
> over accounts.  In one such episode, LSC tried to win a magazine
> account away from incumbent Quad.  On hearing of the potential
> loss to LSC, Quad's CEO responded personally by dropping
> Quad's price 25%.  When the publisher returned to LSC and
> described the "Godfather deal" the Quad CEO had offered, LSC
> responded with even better terms, continuing a cycle of improved
> bids that resulted in around $6.5 million in immediate benefits to
> the publisher.  Because of the strong LSC response to Quad's offer,
> the publisher moved the account to LSC.  Competition like this has
> prompted many, including LSC's magazine head, to avoid any
> negative changes to customer accounts, such as altering freight or
> co-mail arrangements, out of fear of the customer going back into
> the market and LSC "get[ing] into a blood bath with Quad."

**ANSWER**:    The Quad Defendants deny the allegation that LSC is Quad's "main competitor."

In fact, when specifically asked during a deposition whether "LSC is Quad's main competitor in

the printing and distribution of magazines," Quad's Chief Executive Officer Mr. Joel Quadracci

only stated that LSC is "one of our competitors."  ***Moreover, Mr. Quadracci specifically testified***

***that Quad's "main competition," at least for catalog customers, "is digital."***  The Quad

Defendants admit that the Complaint purports to quote an unspecified document about "Quad and

[LSC] control[ing] more than half of all publication printing" (alterations in the Complaint), but

deny any characterization thereof.  In particular, the Quad Defendants state that this document

was prepared in March 2016, and thus refers to LSC's predecessor company R.R. Donnelley.  In

October 2016, R.R. Donnelley split up into three different companies, one of which is LSC.  Since

that time, LSC's stock price has dropped by nearly 90%, and LSC has closed or sold more than half a dozen plants. Meanwhile, the magazine industry has changed considerably since March 2016, with major titles like *Redbook*, *ESPN the Magazine*, and *Glamour* ceasing print editions and instead going "digital only," and with virtually all other major publications either reducing page counts, frequencies, and/or circulations. The Quad Defendants therefore deny the accuracy of the Division's quotation, modification, and characterization of the document. The Quad Defendants admit that the Complaint purports to reference other unspecified events and to quote from other unspecified documents of LSC's, the truth of which the Quad Defendants lack information sufficient to admit or deny; the Quad Defendants therefore deny these allegations. The Quad Defendants deny the remaining allegations of Paragraph 16.

17.     Catalog printing services is a "two-horse race between LSC and Quad," with the two firms holding a combined 69% share of the market according to a Quad Board of Directors deck. Much like magazines, customers frequently play the two off one another for better contract terms. For example, Quad had been the incumbent for one catalog publisher for over twenty years. After multiple rounds of improving bids, however, LSC won the business with a superior offer that included a $1.4 million signing bonus. On informing Quad of its disappointment with the loss, the customer added that it was nevertheless "pleased with the outcome from a pricing standpoint." In another episode, after learning of an LSC offer that was "concerning on multiple levels," Quad's CEO proposed a "massive signing bonus" to keep a major customer. When the final offers were weighed, the customer informed Quad that LSC had won. Given the intensity of the competition, however, rather than accepting the loss Quad's CEO offered to improve the package and double the signing bonus to $10 million. Ultimately, LSC won the battle and secured what LSC's head described as "a great win." The cost of these competitive catalog episodes is not lost on Quad and LSC. On hearing of the merger, for example, one Quad executive reflected on a recent account battle between Quad and LSC and remarked, "I admit, in the case of [a large customer] I'm taking significant satisfaction in the news . . . . I'm sure it's a bitter pill to swallow for them including one source for gravure moving forward."

**ANSWER**:   The Quad Defendants deny the allegation that catalog printing services are a "two-horse race" between LSC and Quad.   The Quad Defendants admit that the Complaint purports to reference an unspecified presentation to the Quad Board of Directors, but deny any characterization thereof.   In particular, the Quad Defendants state that the document the Complaint cites was prepared in July 2016, and refers to LSC's predecessor company R.R. Donnelley.   The Quad Defendants thus incorporate by reference their response to Paragraph 16, and deny the accuracy of the Division's characterization of the document.   The Quad Defendants also admit that the Complaint purports to quote an unspecified comment from an unnamed "Quad executive," but deny any characterization thereof.   Among other things, the Quad Defendants state that the comment the Division has cited was not, in fact, made by a Quad "executive" as alleged in the Complaint.   The Quad Defendants deny the allegation of "intensity" of competition, but otherwise admit the allegations of the eighth sentence of Paragraph 17.   The Quad Defendants admit the allegations of the third, fifth, sixth, and seventh sentences of Paragraph 17, and deny the allegations of the first, second, and tenth sentences of Paragraph 17.   The Quad Defendants lack information sufficient to admit or deny the remaining allegations of Paragraph 17, and therefore deny these allegations.

> 18.    Quad and LSC are also aggressive competitors and key rivals in book printing.   As Quad executives explained in an internal presentation, "we are the only printer other than LSC that can offer the largest Publishers a complete solution."   This structure has resulted in substantial head-to-head competition between the two firms.   For example, in one round of bidding for a major book publisher, four firms initially bid, but the publisher shortlisted Quad and LSC as the only bidders capable of handling the account.   Quad came into the bid with an aggressive offer, alarming many at LSC. As one executive described it, "Quad is on fire, promising everything."   As bidding intensified, the LSC executive exclaimed that bidding for the publisher is "the battleground.   It's Gettysburg. We must win."   When Quad submitted its final offer that would save the publisher $37 million over its current arrangement, however, it

won the account. Quad and LSC executives have lamented the ease with which publishers play the two firms off one another, commenting in one such instance that a publisher was "exploiting the fact that LSC [and] Quad['s] CEO's want to beat each other into oblivion." Episodes like these demonstrate why LSC's CEO told investors that a merger with Quad could achieve "pricing stability" and eliminate such "battle[s]" between the companies.

**ANSWER**:  The Quad Defendants deny the allegation that Quad is "the only printer other than LSC that can offer the largest Publishers a complete solution." The Quad Defendants further deny the allegation that "Quad executives explained [this statement] in an internal presentation." To the contrary, the Quad Defendants state that the document the Division has cited[5] was an early draft of a presentation from 2016. The statement that the Complaint quotes was not accurate when it was put into the early draft. The statement was therefore removed before the presentation was finalized for submission to the Board. The Quad Defendants note that the very same page of the early draft presentation that is quoted in the Complaint also includes comments (which were also removed in the final version of the presentation) that "Competition in the Book space remains fierce but fragmented" and that "Amazon [is] in the clear leadership position" with R.R. Donnelley. The Quad Defendants thus incorporate by reference their response to Paragraph 16, and deny the accuracy of the Division's characterization of the document and, furthermore, deny that the comment was even accurate in 2016. The Quad Defendants deny the allegations of the first, second, third, and last (tenth) sentences of Paragraph 18. As to the tenth/last sentence of Paragraph 18, the Quad Defendants incorporate their response to Paragraph 2. The Quad

---

[5] Although the Division does not identify the source of the alleged statement, on information and belief the Quad Defendants state that they understand the statement to have come from a draft strategic plan that Quad has previously provided to the Division, among other instances, Bates numbered as QUAD-2Re-02288282. That document is a very early draft of a presentation which was never provided to Quad's Board of Directors; the cited document was prepared on May 23, 2016 (eight weeks before the actual presentation was given to the Board on July 18, 2016). This early draft was sent as an attachment to an email that included an explanatory note: "This is the basic format we were going to use. Still a lot of work to do."

Defendants lack information sufficient to admit or deny the remaining allegations of Paragraph 18, and therefore deny these allegations.

> 19.    Overall, publishers and consumers have benefitted from the lower prices and quality improvements that have resulted from the intense head-to-head competition between Quad and LSC for printing services.  Quad's proposed acquisition of LSC would eliminate that competition.

**ANSWER**:    The Quad Defendants admit that Quad has from time to time competed with LSC, among many other competitors, on price and/or quality to win customers' business.  The Quad Defendants further admit that LSC would cease to be a competitor to Quad upon Quad's acquisition of LSC.  The Quad Defendants deny the remaining allegations of Paragraph 19.

> 20.    *Magazine Printing Services*. Printing services sold to U.S. publishers of magazines distributed in the U.S. constitute a relevant antitrust market and line of commerce under Section 7 of the Clayton Act.  Printing services include the printing, binding, and distribution of magazines.  A hypothetical monopolist of magazine printing services sold to U.S. publishers could profitably increase prices by at least a small but significant and non-transitory amount.

**ANSWER**:    The allegations of Paragraph 20 contain legal conclusions to which no response is required.  To the extent a response is deemed required, the Quad Defendants deny the allegations in Paragraph 20.  Among other things, the market definition alleged in Paragraph 20 fails to account for the fact that printers of products like catalogs, trade books, education books, direct mail, retail inserts, directories, brochures, calendars, professional books, and children's books can readily shift their equipment to produce magazines.  The market definition alleged in Paragraph 20 also fails to account for the continuing switch by magazines from a print format to a digital or online format.

> 21.    *Catalog Printing Services*. Printing services sold to U.S. publishers of catalogs distributed in the U.S. constitute a relevant antitrust market and line of commerce under Section 7 of the Clayton Act.  Printing services include the printing, binding, and distribution of catalogs.  A hypothetical monopolist of catalog printing services

> sold to U.S. publishers could profitably increase prices by at least a small but significant and non-transitory amount.

**ANSWER**: The allegations of Paragraph 21 contain legal conclusions to which no response is required. To the extent a response is deemed required, the Quad Defendants deny the allegations in Paragraph 21. Among other things, the market definition alleged in Paragraph 21 fails to account for the fact that printers of products like magazines, trade books, education books, direct mail, retail inserts, directories, brochures, calendars, professional books, and children's books can readily shift their equipment to produce catalogs. The market definition alleged in Paragraph 21 also fails to account for catalog print customers' focus on return on investment and their selection between a variety of channels (including catalog, direct mail and retail inserts as well as digital options) to sell products. An increase in the price of print services for catalogs would cause the price hike to prove unprofitable as these customers could switch some part of their catalog print spend to one of these alternatives. Customers have acknowledged that they have the ability to move much of their marketing dollars from catalogs to digital or other advertising channels if Quad attempted to increase catalog prices.

> 22. *One-Color Trade Book Printing Services*. Printing services sold to major U.S. publishers of one-color trade books distributed in the U.S. constitute a relevant antitrust market and line of commerce under Section 7 of the Clayton Act. One-color trade books include fiction and non-fiction general interest books printed in black and white. Printing services include the printing and binding of such books. Major trade book publishers that require capacity to print in high-volume print runs have different needs than small, independent publishers with limited sales. A hypothetical monopolist of one-color trade book printing services sold to major U.S. publishers could profitably increase prices by at least a small but significant and non-transitory amount.

**ANSWER**: The allegations of Paragraph 22 contain legal conclusions to which no response is required. To the extent a response is deemed required, the Quad Defendants deny the allegations in Paragraph 22. Among other things, the market definition alleged in Paragraph 22 fails to

account for the fact that printers of products like magazines, catalogs, multi-color trade books, education books, direct mail, retail inserts, directories, brochures, calendars, professional books, and children's books can readily shift their equipment to produce one-color trade books. The market definition alleged in Paragraph 22 is also improperly limited to services sold to "major U.S. publishers," which is a false and gerrymandered market definition that would exclude the vast majority of Quad's book customers from the Court's analysis. *See generally Menasha Corp. v. News America Marketing In-Store, Inc.*, 354 F.3d 661, 665 (7th Cir 2004) ("Attributes of shoppers do not identify markets.").

> 23. *Education Book Printing Services*. Printing services sold to major U.S. publishers of education books distributed in the U.S. constitute a relevant antitrust market and line of commerce under Section 7 of the Clayton Act. Education books include K-12 and college textbooks and workbooks printed in either black and white or color. Printing services include the printing and binding of such books. Major education book publishers that require high-volume print runs have different needs than small, independent publishers with limited sales. A hypothetical monopolist of education book printing services sold to major U.S. publishers could profitably increase prices by at least a small but significant and non-transitory amount.

**ANSWER**:     The allegations of Paragraph 23 contain legal conclusions to which no response is required. To the extent a response is deemed required, the Quad Defendants deny the allegations in Paragraph 23. Among other things, the market definition alleged in Paragraph 23 fails to account for the fact that printers of products like magazines, catalogs, trade books, direct mail, retail inserts, directories, brochures, calendars, professional books, and children's books can readily shift their equipment to produce education books. The market definition alleged in Paragraph 23 is also improperly limited to services sold to "major U.S. publishers," which is a false and gerrymandered market definition that would exclude the vast majority of Quad's book customers from the Court's analysis. *See generally Menasha Corp. v. News America Marketing*

*In-Store, Inc.*, 354 F.3d 661, 665 (7th Cir 2004) ("Attributes of shoppers do not identify markets."). The market definition alleged in Paragraph 23 also fails to account for the trend to use softcover books and electronic books to reduce the costs of hardcover textbooks.

> 24. No reasonably interchangeable substitutes exist for magazine, catalog, education, or one-color trade book printing services. Customers would not sufficiently shift to digital platforms to make a small but significant non-transitory increase in the price of printing services unprofitable. Demand for digital or printed content is driven by the consumer and reflects the needs of the publisher and advertisers in those publications. Significant substitution between those two very different media would not occur in response to a small change in relative prices. As large customer segments continue to demand printed magazines, catalogs, and books, publishers must contract with printers to print such content.

**ANSWER**: The Quad Defendants deny the allegations of Paragraph 24.

> 25. The proposed acquisition would eliminate competition between Quad and LSC and significantly increase concentration in already concentrated markets. The proposed acquisition likely would lead Quad to, among other things, reduce printing capacity, reduce printing quality, and raise the prices of its printing services above those that would prevail absent the transaction. It would combine the two largest providers of magazine, catalog, and book printing services and prevent publishers from pitting Quad and LSC against each other in negotiations, raising publishers' costs. The proposed acquisition also likely would enable the merged firm to reduce capacity, limiting the availability or delaying the production of magazines, catalogs, and books.

**ANSWER**: The Quad Defendants deny the allegations of Paragraph 25.

> 26. The proposed acquisition would result in a single firm with a significant share of each of the relevant markets. Although there are competitors to Quad and LSC in the relevant markets, they lack significant capacity, capabilities, and scale necessary to service many accounts. For example, LSC dismissed the next largest catalog printer (behind Quad and LSC itself) as a niche firm that merely "lives off our scraps." Similarly, in book printing, when LSC sales staff learned that one of the next largest printers might bid on a major account, they described that competitor as a "band of bandits" and concluded, "it's all about [Q]uad, nobody else."

**ANSWER**: The Quad Defendants admit that there are competitors to Quad and LSC for each of the alleged relevant markets. The Quad Defendants admit that the Complaint purports to reference other unspecified events and to quote from other unspecified documents of LSC's, the truth of which the Quad Defendants lack information sufficient to admit or deny; the Quad Defendants therefore deny these allegations. The Quad Defendants deny the remaining allegations of Paragraph 26.

> 27. The proposed combination of Quad and LSC creates a presumption that the acquisition likely substantially lessens competition. The Supreme Court has held that mergers that significantly increase concentration in already concentrated markets are presumptively anticompetitive and therefore presumptively unlawful. To measure market concentration, courts often use the Herfindahl-Hirschman Index ("HHI"). HHIs range from 0 in markets with no concentration to 10,000 in markets where one firm has 100 percent market share. Courts have found that mergers that increase the HHI by more than 200 and result in an HHI above 2,500 in any market are presumed to be anticompetitive. Here, these criteria are met for each of the relevant markets. Quad's acquisition of LSC is therefore presumptively anticompetitive.

**ANSWER**: The allegations of Paragraph 27 contain legal conclusions to which no response is required. To the extent a response is deemed required, the Quad Defendants deny the allegations in Paragraph 27 and further note that the Division fails to specify what the Division believes are the amount of increases and the post-merger HHI values in the markets alleged.

> 28. The proposed acquisition would likely result in higher prices in the relevant markets than would exist absent the transaction. Printing services are critical for magazine, catalog, and book publishers, which resist substituting away from printing as large segments of readers and consumers demand such products. Quad and LSC frequently compete head to head for accounts, and engage in multiple rounds of bidding in which they repeatedly lower prices in response to the other. Moreover, because of the scale and the scope of their services, Quad and LSC are often the only two firms providing cost-effective printing services to many publishers. The combination of Defendants' superior scale, efficient high-volume equipment, and cost-saving co-mail distribution, results in the two

firms being the only realistic option for many publishers. The transaction would likely leave many of those publishers facing a single firm with the incentive and ability to increase the prices of its printing services.

**ANSWER**: The Quad Defendants admit that Quad has from time to time competed with LSC, among many other competitors, on price to win customers' business. The Quad Defendants deny the remaining allegations of Paragraph 28 and affirmatively state that that any post-transaction effort by Quad to raise prices would result in work moving to other printers and to digital channels.

29. The proposed acquisition is likely to reduce the quality of printing services, as well as innovation in the relevant markets. During negotiations, Quad and LSC offer better terms including improved delivery dates and printing schedules, printing at certain facilities on better equipment, or commitments to invest in equipment to handle publishers' specifications. In addition, during the execution of contracts, customers dissatisfied with the quality of printing services from Quad and LSC have threatened to switch their business from one to the other to enforce quality standards in their printing contracts. Absent the competitive threat that LSC serves, post-merger Quad would no longer have the incentive to make such quality commitments.

**ANSWER**: The Quad Defendants admit that Quad has from time to time competed with LSC, among many other competitors, on terms, facilities, and/or quality to win customers' business. The Quad Defendants deny the remaining allegations of Paragraph 29.

30. Defendants also have plans to reduce the merged firm's printing capacity by closing printing facilities around the country. As the printing industry has consolidated in recent years, printing capacity has been taken offline, leading to capacity shortages for publishers during peak times of the year. In bidding episodes, Quad and LSC have offered to make investments in additional equipment to assuage concerns about capacity and win the bid. The capacity reductions that would result from the transaction would exacerbate existing capacity issues in parts of the market. Although small competitors have the capacity to take on limited volume, this would not be sufficient to counteract a price increase by the merged firm.

**ANSWER**: The Quad Defendants admit that, as more and more print customers have shifted to digital channels, Quad and LSC both have significant excess capacity; Quad therefore plans to

use the acquisition of LSC to effect the orderly reduction of excess capacity in a way that (i) achieves more cost savings for customers than the two companies could achieve on their own; (ii) minimizes the burdens imposed on customers; and (iii) ensures that the best and most efficient capacity remains in operation after closing. The Quad Defendants further admit that certain customers can and do use the promise of multi-year contracts to sponsor entry or expansion by competing printers. Quad (and, on information and belief, other competing printers) have from time to time offered to make investments in additional equipment in return for the customer providing a multi-year contract. The Quad Defendants lack information sufficient to admit or deny the remaining allegations of the third sentence of Paragraph 30, and therefore deny these allegations. The Quad Defendants also admit, on information and belief, that competing printers currently have excess capacity as well, and that this excess capacity in the industry will not only continue to exist after the transaction closes but will only grow as demand for printed products continues to decline. The Quad Defendants deny the remaining allegations of Paragraph 30.

> 31.     Overall, head-to-head competition between Quad and LSC has spurred quality improvements and lower prices for magazine, catalog, and book printing services. The proposed acquisition would eliminate this important competitive pressure and allow Quad to limit capacity, reduce quality, and increase price of printing without the constraints of significant market competition.

**ANSWER**:     The Quad Defendants admit that Quad has from time to time competed with LSC, among many other competitors, on price and/or quality to win customers' business. The Quad Defendants deny the remaining allegations of Paragraph 31.

> 32.     Barriers to economically meaningful entry or expansion in the magazine, catalog, and education and one-color trade book printing services markets are high, and thus new entry or expansion by existing competitors is unlikely to prevent or counteract the proposed acquisition's likely anticompetitive effects. Quad and LSC have built rival networks of printing facilities across the country that they each integrate into sophisticated distribution

systems. Building a new printing facility, or even introducing new printing equipment to an existing facility, can take years to complete. Other firms seeking to enter the market or expand would need to spend a significant amount of time and money to acquire expensive printing equipment from one of a limited number of remaining sources for such equipment, build new facilities and accompanying infrastructure, and hire skilled workers from a limited employment pool. Even after taking on this costly and time-consuming investment, without the scale of orders needed to operate efficiently, the firm would not be able offer the same cost-effective postal distribution and other solutions as Quad and LSC do today.

**ANSWER**:     The Quad Defendants deny the allegations of Paragraph 32.

33.     Although Defendants allege that the proposed acquisition will generate synergies by combining the operations of the two largest printers in the country, those may actually harm competition by reducing available capacity, most are unlikely to be passed through to customers, and collectively they are far outweighed by the proposed acquisition's likely anticompetitive effects.

**ANSWER**:     The Quad Defendants admit that the proposed acquisition will generate substantial synergies, efficiencies, and other benefits that will allow the combined firm to lower the overall cost of printing magazines, catalogs, books, and other products, while at the same time creating quality and time-saving improvements for customers and end-consumers. The Quad Defendants further state that many customers have expressed their support for the proposed acquisition, and that in each of Quad's prior print acquisitions Quad's customers realized significant savings from Quad's integration and synergy efforts. The Quad Defendants deny the remaining allegations of Paragraph 33.

34.     The United States brings this action under Section 15 of the Clayton Act, 15 U.S.C. § 25, to prevent and restrain the Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18. This Court has subject matter jurisdiction over this action under Section 15 of the Clayton Act, 15 U.S.C. § 25.

**ANSWER**:     The Quad Defendants admit that the Division purports to bring this action under Section 15 of the Clayton Act, 15 U.S.C. § 25, and that the Division alleges a violation of Section

7 of the Clayton Act, 15 U.S.C. § 18.  The Quad Defendants do not contest that this Court has subject-matter jurisdiction over this action.  The Quad Defendants deny that the Transaction would violate Section 7 of the Clayton Act.

35.     Defendants Quad and LSC are engaged in interstate commerce and in activities substantially affecting interstate commerce.  Quad and LSC sell magazine, catalog, and book printing services throughout the United States.  They are engaged in a regular, continuous, and substantial flow of interstate commerce, and their printing services sales have had a substantial effect on interstate commerce.

**ANSWER**:     The Quad Defendants admit the allegations of Paragraph 35.

36.     This Court has personal jurisdiction over each Defendant. Both Quad and LSC are corporations that transact business within this district through, among other things, their sales of printing services.

**ANSWER**:     For purposes of this case only, the Quad Defendants do not contest the allegations of Paragraph 36.

37.     Venue is proper in this district under Section 12 of the Clayton Act, 15 U.S.C. § 22.

**ANSWER**:     For purposes of this case only, the Quad Defendants do not contest the allegations of Paragraph 37.

38.     If allowed to proceed, Quad's proposed acquisition of LSC would likely lessen competition substantially in the markets for magazine, catalog, one-color trade book, and education book printing services in the United States in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

**ANSWER**:     The Quad Defendants deny the allegations of Paragraph 38.

39.     Among other things, the transaction would:

(a)     eliminate significant head-to-head competition between Quad and LSC in the markets for magazine, catalog, and education and one-color trade book printing services;

(b)    likely cause prices of magazine, catalog, and education and one-color trade book printing services to be higher than they would be otherwise;

(c)    likely cause the quality of magazine, catalog, and education and one-color trade book printing services to decrease; and

(d)    likely reduce capacity for and output of printed magazines, catalogs, and education and one-color trade books.

**ANSWER**:    The Quad Defendants deny the allegations of Paragraph 39.

40.    The United States requests:

(a)    that Quad's proposed acquisition of LSC be adjudged to violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

(b)    that the Defendants be permanently enjoined and restrained from carrying out the proposed acquisition of LSC by Quad or any other transaction that would combine the two companies;

(c)    that the United States be awarded costs of this action; and

(d)    that the United States be awarded such other relief as the Court may deem just and proper.

**ANSWER**:    The allegations of Paragraph 40 do not contain factual allegations to which a response is required.  To the extent a response is deemed required, the Quad Defendants admit that the Division requests the relief described in Paragraph 40, but deny that Quad's proposed acquisition of LSC violates Section 7 of the Clayton Act, 15 U.S.C. § 18, or that the Division is entitled to any relief whatsoever.

## AFFIRMATIVE DEFENSES

The Quad Defendants set forth below their affirmative defenses.  By setting forth these affirmative defenses, the Quad Defendants do not assume the burden of proving any fact, issue, or element of a cause of action where such burden properly belongs to the Division.

1.    The Complaint fails to state a claim upon which relief can be granted.  Among other things, the Complaint fails to properly define any relevant markets as a matter of well-settled

law, because (i) it fails to account for other substitute products to which customers would turn in response to any attempt by Quad to price above competitive levels (*e.g.*, other print products, digital/online channels), and (ii) it fails to account for the fact that printers of products like direct mail, retail inserts, directories, brochures, calendars, multi-color trade books, professional books, and children's books can readily shift the exact same equipment that they use to print these products to instead print magazines, catalogs, one-color trade books, or education books. As Mr. Quinlan actually said in the same earnings call that the Division repeatedly, but incorrectly, cites in the Complaint: "A press is a press, it can print anything." *See* Answer ¶ 2. *See generally Menasha Corp. v. News America Marketing In-Store, Inc.*, 354 F.3d 661, 665 (7th Cir 2004) ("Suppose that a well-conducted survey shows that vanilla is people's favorite flavor of ice cream, and by a large margin. It would not follow that vanilla ice cream is a separate market, because if its price rises any other ice cream producer could make more vanilla and less chocolate or pistachio."); *Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 65 F.3d 1406, 1410 (7th Cir. 1995) ("[T]he definition of a market depends on substitutability on the supply side as well as on the demand side. Even if two products are completely different from the consumer's standpoint, if they are made by the same producers an increase in the price of one that is not cost-justified will induce producers to shift production from the other product to this one in order to increase their profits by selling at a supracompetitive price.").

2. There is substantial excess capacity and low barriers to entry and expansion in the printing industry, such that customers and/or competitors would be readily able to defeat any attempt post-transaction to raise prices, reduce output, or otherwise lessen competition.

3. The vast majority of Quad's customers are relatively small publishers and marketers that can readily shift to any of a number of competing printers. The Complaint thus

only alleges that Quad's proposed acquisition of LSC might affect competition for Quad and LSC's very largest customers, namely the small number of "major" customers that obtain "multi-year contracts" through multiple rounds of protracted negotiations. *See generally* Compl. ¶¶ 7, 15, 17-18, 22-23, 26, 29. However, this small number of "major" customers are readily able and incentivized to protect themselves, among other ways, by sponsoring (or threatening to sponsor) competitors' entry or expansion; by integrating (or threatening to integrate) vertically; and/or by moving (or threatening to move) all or part of their print work to other print formats or to alternative channels like digital formats.

4.     The Complaint assumes that competition in the past between Quad and LSC (and between Quad and LSC's predecessor company R.R. Donnelly) is indicative of competition today and in the future. In actuality, however, as larger and larger volumes of printed products move to digital channels, Quad and LSC are currently, and in the future will increasingly become, weaker competitors than they have been in the past. *See generally Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 277 n.22 (7th Cir. 1981) ("the financial weakness of the acquired firm may be a relevant factor in some cases" (quotation and alteration omitted)).

5.     Quad's proposed acquisition of LSC will create substantial synergies, efficiencies, and other benefits that will allow the combined firm to lower the overall cost of printing magazines, catalogs, books, and other products, while at the same time creating quality and time-saving improvements for customers and end-consumers. These synergies, efficiencies, and other benefits are pro-competitive, and the proposed acquisition therefore will benefit customers and end-consumers by increasing competition not only between the combined company and other commercial printers, but also between print products and digital alternatives. In view of these

synergies, efficiencies, and other benefits, many customers have already expressed their support for the proposed acquisition.

6.	The injunctive relief sought in the Complaint is contrary to the public interest and, in fact, enjoining the Transaction is likely to result in the separate companies having higher cost structures, less flexible capacity, and less ability to invest in innovation than would result from the integration of the two companies and the synergies realized as a result.

7.	Alternatively, should the Court find that any aspect of Quad's proposed acquisition of LSC violates Section 7 of the Clayton Act, 15 U.S.C. § 18, then the Court should not enjoin the proposed acquisition, but instead should allow the proposed transaction to close, subject to the divestiture package that the Quad Defendants have proposed to the Division.

## RESERVATION OF RIGHTS TO ASSERT ADDITIONAL DEFENSES

The Quad Defendants have not knowingly or intentionally waived any applicable defenses, and they reserve the right to assert and rely upon other applicable defenses that may become available or apparent during discovery in this matter.  The Quad Defendants therefore reserve the right to seek to amend this Answer and/or Affirmative Defenses.

Dated:  July 17, 2019	Respectfully submitted,

/s/ James T. McKeown
James T. McKeown
Andrew J. Wronski
Alyssa S. Markenson
Max S. Meckstroth
FOLEY & LARDNER LLP
777 East Wisconsin Avenue
Milwaukee, WI 53202-5306
Telephone: 414.271.2400
Facsimile: 414.297.4900
jmckeown@foley.com

awronski@foley.com
amarkenson@foley.com
mmeckstroth@foley.com

Joanne Molinaro (ARDC #6283350)
FOLEY & LARDNER LLP
321 North Clark Street, Suite 2800
Chicago, IL 60654-5313
Telephone: 312.832.4500
Facsimile: 312.832.4700
jmolinaro@foley.com

Benjamin R. Dryden
Jesse L. Beringer
FOLEY & LARDNER LLP
Washington Harbour
3000 K Street, N.W., Suite 600
Washington, D.C. 20007-5109
Telephone: 202-672.5300
Facsimile: 202.672.5399
bdryden@foley.com
jberinger@foley.com

*Attorneys for Defendants Quad/Graphics, Inc. and QLC Merger Sub, Inc.*

## **PROOF OF SERVICE**

I, James T. McKeown, an attorney, hereby certify that on July 17, 2019, I caused the

foregoing QUAD/GRAPHICS, INC. AND QLC MERGER SUB, INC.'S ANSWER TO

COMPLAINT to be served on counsel of record via the Court's Electronic Case Filing system.

/s/ James T. McKeown
James T. McKeown